Would the clerk call the first case, please? Case number 245421, Jessica Clippinger v. State Farm Automotive Insurance Company, oral argument not to exceed 15 minutes per side. Mr. Robertson for the appellant. Good morning. Judge Moore, I've reserved three minutes for rebuttal. Thank you. My name is Eric Robertson and I represent State Farm. This court should vacate the district court's order certifying a class of more than 95,000 Tennessee insureds based on nothing more than a legal injury theory of liability. Ms. Clippinger isn't a member of the class she purports to represent. She is seeking a different set of damages based on an entirely different theory of liability and for that reason she is atypical and inadequate and the court can vacate the district court's order on that ground alone. Is her theory of liability different because you insisted on the arbitration type of approach, the appraisal approach, and therefore she went through the appraisal and ended up getting a higher amount than you had originally paid her but that she still has costs and damages that are associated with the fact that the system that you were using was flawed in her view? Your honor, kind of the background of that appraisal process, the policy at issue, first of all Ms. Clippinger brings a breach of contract claim. We addressed the certification question first by looking at what the claims are. The actual cash value is determined by an agreement or by an appraisal. We paid Ms. Clippinger what was called the auto source value which we thought she agreed with. About a year went by, then she sued us, then we did invoke the appraisal provision in the policy on the basis that she disagreed with the bank. But when she sued you had not invoked that appraisal policy so you, I'm wondering if you're sort of picking her off to that part of my question. Sure, the first question is did we invoke appraisal after the lawsuit was filed? The answer is yes and the reason why is because that was the first indication of any disagreement that we had. She never contacted State Farm, she never provided additional information, so the answer to that is yes. Why shouldn't we treat typicality like standing? So standing you evaluate at the date of the lawsuit. So at the date of the lawsuit she was clearly a member of the class. I think if you treat typicality like standing, actually standing needs to be shown throughout the entire course of the litigation. No, it becomes moodness. Well, in the context of typicality, your honor, there are events that can occur during the course of the litigation that can render someone atypical. So is there any, I was curious, I didn't see the parties discuss this at all, this timing question with respect to typicality. Is there any case law on how typicality or excuse me, when typicality should be measured? I'm not aware of standing here today, your honor, and you're right the parties didn't address it in the briefs. Why, so the court has clearly said a party whose claim has been mooted can under certain circumstances continue to represent a class and a class can continue to go forward. So clearly there are situations where the court doesn't think the fact that something has happened to the named plaintiff after the fact renders that plaintiff atypical. So if a plaintiff whose claim is moot can still represent a class, why wouldn't that logic apply here even though we all agree it's not moodness because there's still the appraisal cost? Your honor, I think two reasons. First, on the typicality piece, plaintiffs sought certification of a particular class definition and that class definition was accepted by the district court and it explicitly excludes people like Ms. Clippinger. So a choice was made to seek certification of a class that does not include Ms. Clippinger and I don't think an injury solely on a legal injury renders her typical to represent the class. But wouldn't you're saying, so I think you would agree with me that the Supreme Court has said a named plaintiff whose claims have been mooted can still represent the class. Presumably that named plaintiff no longer has typical claims in your logic because the plaintiff is not a member of the class because the plaintiff's claims have been mooted. But nevertheless, the court has allowed the class to continue. And Judge Murphy, what exact case are we discussing? Well, it's just generic Supreme Court cases on when mootness renders a class inappropriate. If a class has been certified, then a plaintiff's claim becomes moot or even if the plaintiff's claim becomes moot beforehand, there is Supreme Court case law that suggests the named plaintiff can continue to represent the class. And it just seems to me that this is very similar. And I'll push back on that a bit, Judge Murphy. Another reason why we're seeking to vacate the district court's order is because Ms. Clippinger is not seeking the same relief as the underlying class and is not even seeking the same damages, which also under authority renders her an inadequate representative. But she's still seeking damages that are related to the policy that is the crux of this. Yeah, and we'd push back on that characterization, but absolutely plaintiffs would say that what they're seeking are consequential damages flowing from what they've called the first breach, and those are the costs of an appraisal. So why don't we get to, assuming she's a good district court, to confirm what the district court did, which is to say that this is an appropriate 23B3 class action? Well, if we're just talking about typicality, we would argue that you can't certify or keep a class certified for a class representative who's not a member of the class she seeks to represent. Assuming that you lose on your argument that Clippinger is not the appropriate class representative, do you lose the whole case then? No, Your Honor. Then we would ask the panel to move on to the predominance arguments, and I'll do that now unless there are additional questions. That's what I was trying to do, so that we could move on to another topic. Thank you, Judge Moore. I appreciate it. I got it. So predominance, it's best to think about this first in terms of analyzing the claims, which this court made clear is the appropriate first step in the Nissan case. Ms. Clippinger brings a claim for breach of contract. The allegation is that State Farm paid less than actual cash value by using a particular software methodology. The obligation in the policy is for State Farm to pay actual cash value as determined by an agreement or by an appraisal. We've talked about the appraisal. Actual cash value is not a defined term in the policy. Under Tennessee law, and I think Mr. Lowther would agree with me, actual cash value is defined to mean the fair market value. Is there a form that you send out if there is no appraisal that says the insured agrees to the number that you have provided? What happens generally, Your Honor, is there is a discussion, usually by phone, between a claim handler and a total loss claimant. They discuss the valuation. If there's an agreement reached during that conversation, I agree with the value, send me the check. State Farm sends a letter, a total loss settlement letter to the claimant explaining this is how we calculate actual cash value. This is the actual cash value we determined. Here's the sales tax and fees. If you've got to pay a lien holder, this is the amount we're going to pay the lien holder, and this is your check. As part of that letter, Your Honor, if you think we've miscalculated the actual cash value or if you have additional information you want us to consider, let us know. The next step of the process is there's a power of attorney form filled out that Ms. Clippinger filled out here, and that power of attorney transfers title of the vehicle over to State Farm in exchange for the payment. When you send this letter, do you say what you think the actual cash value is with a dollar amount, and do you say how you calculated the actual cash value in that letter? The letter says we calculate actual cash value by looking at vehicle valuation services, other sources, materials you provide. It's kind of a generic description. Okay, so did you in the letter ever say that you're taking a TND, Typical Negotiation Deduction, or TNA, Typical Negotiation Adjustment? The letter does not include anything specifically about the auto source methodology or what we'd call the Typical Negotiation Adjustment. The auto source report itself discusses the Typical Negotiation Adjustment, and that's generally provided to the insured as part of this total loss claim settlement process if requested or if it comes up. In this case, Ms. Clippinger has stated that she received a that report before she accepted the value. Okay, but I'm curious for the whole class. Was the class or is your position that the class members are all aware of the TND or TNA being deducted, or do you have a position on that? Our position, I think, is I don't know. I think that would be a highly individualized question to determine what information each class member had and whether they accepted the value based on whatever information that they had. I can tell you just from reviewing a lot of claim files that a lot of claimants come to this process having a pretty good sense of what their vehicle is worth because they've looked it up on the internet or they've looked at a NATA guide or a Kelley Blue Book value. So they're coming into this process with some information. There are some people who don't do that, of course, but it would be a claim file by claim file review for me to determine that or maybe even interviewing these folks. And I don't want to go too... I'm happy to answer these questions, of course, but I don't want to go too off the rails because this really isn't a nondisclosure case. It's... So the best argument I think you have is that this case is going to boil down into 90,000 individual valuations. But the response to that is no, it's going to be a formulaic damages model. And that formulaic damages model is just deducting the typical negotiated deduction. And that is the amount of damages for every class member. Very easy. What's wrong with that analysis? A couple things, Your Honor. Plaintiff come forward and say, all we need to do is refund the typical negotiation adjustment. The problem is that the policy does not prescribe any particular methodology on State Farm's part. It only obligates State Farm to pay actual cash value. It's not a provision that says you must use the Kelly Blue Book or you must use the NADA guide. But the plaintiff's position is that the actual cash value is not what you're paying because you are deducting the TND. Correct, Your Honor. And we at trial will be able to rebut that evidence with evidence saying, well, the TNA is appropriately calculated. It's based on data. But we can also defend the case on the basis that regardless of the validity of the TNA, we still paid Ms. Klippinger or the named plaintiff actual cash value based on any number of permissible valuations. That's Lara. That's the Sampson case. How often does it work in practice? Is there any evidence in the record that during this negotiation process you depart from the auto or you departed from the report? And then like say an insured came to you and say, well, I got these two Blue Book things. And is there a negotiation there? Or is it just formally like an offer of this is the amount we're going to provide. And then you can either use the appraisal option or that's it. In my time's up, may I answer your question? You can answer. Yes, definitely. Thank you, Judge Moore. There is evidence in the record. This would be in the graph declaration at docket number 146-1. And let me give you a page ID number. I'll try to find it in my break and I'll give it to you. I'm sorry. I don't want to waste your time. But basically, Mr. Graf is a claims consultant and head of total loss. And what he explains is that claim handlers have a lot of discretion to come to an agreement. It's part of the insurance policy. It's also part of the practice. They want to come to an agreement with the insured on actual cash value because there really is no empirical number. So the auto source value is used as a starting point, not an end point. State farm claim handlers have discretion to get a different auto source valuation using different comparables, a different methodology altogether like dealer quotes that don't include typical negotiation adjustments. They have the authority to use blue book or nada guides or take information from the claimant. The figure that's in the record is generally insured and state farm come to an agreement on that first value about 70 or so percent of the time. Thank you. Thank you, Your Honor. Good morning, Your Honors. My name is Lee Lowther on behalf of the plaintiff, Apolli. Judge Parker was well within his discretion in certifying a class that challenged a single line item deduction in state farm's chosen methodology for determining the actual cash value of its records. Four circuits, this court in Hicks, the fifth and the eighth circuits in Mitchell and Stewart, JAMA in the ninth circuit, and now 13 district courts looking at claims challenging negotiation deductions have determined for breach of contract claims, these are eminently suitable for class treatment. This court's review on abuse of discretion in the class action context is narrow. That's because the district courts have some significant discretion in how they manage their own docket. This court reverses orders granting class certification only when it is left with a clear and definite conviction that the appellant has shown an abuse of discretion. Judge Parker applied the applicable law to each element of Rule 23A and 23B3 and made factual findings from the record evidence that plaintiff presented that they had shown that common issues are likely to predominate, and he concluded, as have 12 other courts on a materially indistinguishable record, that plaintiff's common proof of breach of liability can be shown through plaintiff's common evidence. What do you do though? It's not clear to me how this case will proceed. Why isn't it pretty powerful to think that every case is going to be its own fact-specific evaluation of the specific car, and so all we're going to have is essentially 90,000 valuation trials after any generic trial on whether the use of the deduction was appropriate? For a few reasons, Your Honor. One, as the district court found, the common question on liability is whether or not the typical negotiation deduction is bunk, whether it's categorically improper and never should have been applied in the first place. The plaintiff's position is that she and every other... I agree with you, so that may show a common question, but that doesn't get So that gets you to common liability. Did State Farm breach its contract with each and every insurer because it did not pay? So I guess this can be answered on a yes or no basis that that was a breach, but I must admit that I do not understand your breach theory because the contract clearly says actual cash value should be determined either by an agreement or an appraisal, and you're essentially saying they breached by offering the first offer in the negotiation on the agreement a number that was too low, but why would the offer be a breach? Your Honor, it's not. So to push back on Mr. Robertson's point, it's not really an offer. State Farm, when they present this, say this is how we get to your actual cash value, and that is accepted by every single member of the class because that is their insurance. But they have the right to either agree or seek an appraisal if they disagree. I mean, this is beside the point. I think that this could be decided commonly across the board. I just don't understand how you're going to win. Sure, and that might be a merits issue, but a few things. One, the three of you are some of the only people in the country who have seen how this typical negotiation deduction is actually calculated and arraigned. It is shrouded in secrecy, and State Farm has a duty to appraise its insured vehicles in good faith. Insurance contracts are the contracts of utmost good faith, and insureds have an expectation that they are getting what they bargained for. The typical negotiation deduction, I'm going to go out on a limb here and say if you were to receive one of those now, you would not be okay with it. And we are asking the jury to make that same determination. How would you decide damages for the members, each member of the class? So we would put forth our damages model based on the common claim, which is simply back out the typical negotiation deduction. That is the same damages model approved by this court in Hicks, the Fifth and the Eighth Circuits in Mitchell and Stewart, JAMA in the Ninth Circuit, and it's the courts across the country in negotiation deduction cases have determined measures, the economic harm from the breach that is asserted. So assume you win on the merits that the TND or TNA is not okay, it's a breach of the contract. Then for each person, the 90,000 people, their remedy would be to back out that, is it a fraction? How do they calculate TND? Typically, it is a percentage of the list price of the vehicle. But what we would do is we would get all the reports and we would do that individually for each member of the class and say, class member number 100, this is the amount that was deducted in your report. Class member 201, same thing. We would show that individually once the liability was proved. Are you contemplating just one trial and no separate individual trials for each insured? So that one trial would be, this is also their damages, the amount of the deduction? So the way that we would contemplate it, and we were a week away from trial in a progressive case in Georgia, challenging typical negotiation deductions. And so the way that we view this and the way that the district court adopted there was they were going to decide, the jury was first going to decide the common issue of whether or not the negotiation deduction was a breach of contract. And then once liability was established, because if we lose, then there's no need to go through class member by class member actually doing the math and pulling reports. So if plaintiffs won, there would be an additional step where you would have a damages trial. And before that damages trial, progressive in that case, State Farm in this case, will produce all of the reports that it used to pay members of the class. We would provide our damages calculations. And if it had any offset defense, for instance, if it said we overstated mileage or any of the arguments that they've made here in the Hicks case and Stewart and Mitchell, well, they would have a chance to put forth their evidence. And then we would . . . Well, what do you do with their notion that each of these, they would have the right to put individualized evidence that this actually does, in this particular case, represent the actual cash value, the amount we paid? And wouldn't that . . . that would not be feasible in one trial. That would be every class member individualized evidence. So that's a manageability concern. And that's one of the concerns that Judge Parker addressed. Yeah, and I'm asking for what your response is. I've not seen a response that has satisfied me. Sure. So in the court below, what would happen is if State Farm were to put on that defense for whatever set or subset of class members who it chose to get that evidence for, then we could put those into buckets and we could figure out, in the district court's discretion, an efficient way to try the cases that it actually puts forth . . . Why would it even be groups? It's so individualized. The buckets would be every class member. This is the evidence. This is the report. These are our comparable vehicles. On the facts of this case, these comparable vehicles actually sold for . . . maybe there was a negotiation in this particular case, so it was actually accurate, so there was no damages. Well, Your Honor, the determination of actual cash values made at that particular point in time, and it's based on . . . the typical negotiation deduction is based on a rigged set of data at that point in time. And so State Farm either breached or did not breach the contract when it applied that deduction and paid that amount. There's no survey process where State Farm keeps tabs on what did each of these individual cars later sell for and then true up with the insurer. The valuation is the valuation, and they either breached or did not breach at the time that they made that valuation. But I don't know that that's helping you, though. That should just suggest the breach itself will be individualized, because even at the liability stage, they're going to be able to do the exact same thing. No, at the liability stage, they won't be able to do the exact same thing. Well, if it really is all about actual cash value and not about how they . . . not about the process by which they go through, they'll be able to say, this number was the actual cash value in this case, and therefore there was no breach. So that is . . . that's a respectfully conflating violation of a contract with the damages you can cover for that contract, for that breach. If the . . . So if there was a particular case, just assume there was, where the use of the adjustment, the negotiated adjustment, did lead to an actual cash value that was accurate, there would be no breach in that particular case, would there? Okay. So, pushback. The evidence is that none of the typical negotiation deductions are accurate. And so if a jury finds that the typical negotiation deduction is accurate, then plaintiffs and every member of the class will have lost, because the allegation and the common evidence is up or down. This is either categorically improper or it's not. Is that true? Because it's just a percentage. I mean, I thought you had a pretty powerful bell curve in your briefs, and some folks are going to be on this side of the bell curve, so there may have been negotiation in their particular cases. You see my point? A bell curve is just an average, and you're saying that they cut off the half where there wasn't an adjustment or something, but it's still just an average of all class members, and some members of the class are going to be on the far side, and so the adjustment may well be accurate for at least some members. Your Honor, the common evidence in this case shows that the adjustment is not accurate for any member of the class. It is all based on purposely rigged data, and if you look at the market as a whole, which is what the typical negotiation deduction, which they are representing, that vehicles typically sell for list price, that's the justification. The bell curve shows, categorically, that is not true. If you look at the market and what State Farm is doing is not paying actual cash value. It's paying artificially reduced cash value to each and every insured, and it does that at the time of valuation and at the time of the payment based on an auto tech's report. There's no individual looking at what vehicles ultimately sold for to determine if what it actually did by rigging data, excluding data, creating a false market, was an artificial reduction of market value, or it was okay. That's the question that the jury is going to be answering, up and down, based on the common course of conduct that they challenge here. The common course . . . Yes, ma'am.  Well, I'm listening to all this, and I was a trial judge for twenty-one years. I cannot say that I tried a class action as complicated as this one would be, but I am assuming that there are well-established methodologies that folks who are . . . We have evidence in the record that you have class action experience and are . . . I assume that you all and the judge could figure out exactly how to get a handle on this case and how to try it in a reasonably efficient manner that doesn't drag you down in looking at each individual plaintiff's story. I guess your models, your damages models, are they produced with the help of an expert whom you probably already hired? They are, absolutely. Then, you've got to figure out with the judge what the questions are with respect to individuals and what are questions with respect to the class as a whole based on whatever methodology you can establish in the record. Am I right about that? That is, Your Honor. You just have to figure out how to get it done. Well, the manageability concern is within the sound discretion of the district court. To go back to the record in this case and whether or not Judge Parker abused his discretion, the argument that they harped on below, defeating predominance, is that they can invoke appraisal. They can. They never said they will. We had a hearing on this issue, and Judge Parker found in his order, they were very careful not to say they would actually do this. It's completely speculative. Also, we're not saying they can't, but let's look at what the record actually is. The record here is that they appraised the class representative's vehicle, and the result of that was that none of the appraisers applied a typical negotiation deduction or anything of the kind, and that State Farm wound up having to pay more than the auto tax report. In Jason Merritt's REIT rebuttal report, that's our appraiser expert, he put in the record the results of two other appraisals that he was involved in where State Farm compelled appraisal. Two of those were in South Carolina. One was in Florida. The result of each of those appraisals was that the appraisers agreed, back out the typical negotiation deduction, the rest stands. What State Farm is saying, we can't stop them from making irrational, poor business decisions and poor customer relations decisions. The record before Judge Parker showed that in every instance in which appraisal has been applied, it resulted in a higher valuation. None of the appraisers applied a typical negotiation deduction. State Farm is not saying, we are going to do this, but even if it does, Judge Parker found that doesn't cure its breach for applying a typical negotiation deduction in the first place. That issue goes to damages, and those damages issues cannot predominate over plaintiff's common showing of liability. With that, Your Honors, I ask that the court affirm the district court plea. Thank you. Your Honors, first on the graph declaration site, that's at page ID 3993 to 3994, paragraphs 26 through 28. I want to pick up both on your point, Judge Gibbons, as well as your point, Judge Murphy, and just think about how this case would be tried on an individual basis. There have been five, six valuations done of Ms. Clippinger's vehicle. NADA value was between $13,000 and $15,000. State Farm's appraiser, Megan O'Rourke, valued the vehicle under auto source at $14,400. There was the auto source value. Plaintiffs have had three appraisers, three separate valuations, $15,000, $17,000, $18,000. The point is that an individual case, that evidence would be presented to a jury, and a jury would decide not whether the typical negotiation adjustment is a breach of contract, but whether State Farm breached the contract by paying less than actual cash value. The jury is going to weigh that evidence, maybe disregard it entirely, and come up with a different value based on its own experience, and make a determination of whether State Farm breached its obligation to pay an amount, not to use a prescribed methodology. My understanding is there are something like 13 district courts that have upheld class certification, and have any of these cases actually proceeded further? No, Your Honor, and just to be clear, there's plenty of district courts and circuit courts that have found certification inappropriate in these circumstances. Mr. Lowther raised an issue about the Brown case. That case was settled. There's been a couple other cases involving Progressive that have also settled. I believe the verdict form that Mr. Lowther was actually describing in Brown, the first issue was not whether the projected sold adjustment was appropriate, it was whether the contract was breached by paying less than actual cash value. The next trial scheduled is actually on June 9th, involving me and Mr. Lowther, actually. What do we do with the case pending at the Supreme Court? There's a case out of the Ninth Circuit Court. Could that affect the analysis here? The JAMA case, Your Honor? Yes. The JAMA case is currently on cert. The answer is, it depends. We think, Mr. Lowther distinguished the Negeth-Bradder JAMA case for years until the Ninth Circuit's decision came out. That was a decision based on a pure regulatory violation, where the plaintiffs claimed, we don't need to prove injury, we don't need to prove underpayment, because a violation of the Washington insurance regulation is enough. We're seeking cert in that case, in part based on the Davis decision, which was just argued earlier this week. If the court is inclined... Is that the case where the scuttlebutt in the reports was that it's going to go off on, whether it's or lack of... The change in events. May I ask a question? Is that the same case? It is the same case. Reading the tea leaves, I'm not sure what's going to happen, but there was certainly plenty of questions about whether the appropriate certification order was being reviewed and whether they could address it. May I quickly answer Judge Murphy's question? I don't think this court needs to wait on JAMA, in part because the issue here really isn't an alleged regulatory violation necessarily establishes injury. It's whether predominating individualized issues relating to the actual cash value determination overwhelm any common ones, and we'd submit that they do. For that reason, we'd ask the court to vacate the order. Thank you both for your argument. The case will be submitted, and the clerk may call the next case.